UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


**Miller Hybrids, Inc.,**
          **Plaintiff,**


**v.**                                       **Case No. 26-cv-1104**


**Agrality Seeds, Inc., and**
**Excel Ag Solutions, LLC,**
          **Defendants.**


---

### COMPLAINT

---

Plaintiff, Miller Hybrids, Inc., states the following in support of its complaint against the Defendants:

### Introduction

1) This case concerns the failure of two seed service companies to comply with basic minimum requirements for processing agricultural seed to maintain varietal and lot integrity.  These failures resulted in commingling and mislabeling of multiple lots of hybrid corn seed thereby causing the destruction of farmers' corn crops, unsellable and useless seed inventory, and a failed commercial launch of a premium corn seed product.

2) Miller Hybrids, Inc. ("Miller Hybrids") is an independent commercial seed company founded by Bob and Pam Miller in 2005, with its corporate headquarters, research operations, and seed warehouse located in Kalona, Iowa. Miller Hybrids develops, produces, and sells premium

1

corn, soybean, and alfalfa seed under its own brand, distributed across the Midwest through a network of independent dealers serving growers in Iowa, Illinois, Wisconsin, Nebraska, and other states.

3) Miller Hybrids operates a full-cycle research and breeding program led by founder Bob Miller. Since its founding, the program has developed fourteen new commercial corn hybrids, evaluates more than one thousand new seed products each year, and has produced a portfolio of conventional and stacked-trait corn genetics with both Miller Hybrids-branded and licensed-out commercial applications.

4) In addition to selling finished hybrid corn seed under the Miller Hybrids brand, Miller Hybrids licenses elite parent inbred lines and finished hybrids developed in its own research program to other commercial seed companies and to foundation seed companies, which in turn use those genetics to produce hybrid corn seed products sold to farmers under various brands.

5) One of the most fundamental and critical aspects of producing crop seed for sale is the maintenance of varietal identity and lot integrity.  Each step in the process, from planting, to harvest, to cleaning, conditioning, bagging, and labeling, must follow strict procedures and protocols to ensure that the variety identity is maintained to the final finished product.  This well-known and long-standing rule of the seed trade is the law of the land, codified in the Federal Seed Act, 7 U.S.C. § 1551 *et seq.*, and the seed laws of every state. *See e.g.,* Indiana Seed Law, § 15-15-1-1 *et seq.*; Iowa Seed Law, § 199.1 *et seq.*; Michigan Seed Law, § 286.701 *et seq.*

6) In 2022, two seed service companies, Agrality Seeds, Inc. ("Agrality") and Excel Ag Solutions, LLC ("Excel"), produced, conditioned, packaged, and labeled five different hybrid corn seed products on behalf of Miller Hybrids.  These hybrid corn seed products were intended for

2

sale to farmers for the 2023 growing season, and for commercial licensing to other seed companies.

7) However, Agrality and Excel failed to maintain the varietal integrity of two of the corn hybrids during production and processing, resulting in several lots of those corn seed products being mixed-up, commingled, and mislabeled when the seed was delivered to Miller Hybrids.

8) As set out in more detail below, these failures by Agrality and Excel to comply with fundamental commercial standards in the seed trade directly caused the destruction of corn crops, the destruction of seed inventory, significant increased cost and expense, and destroyed the commercial launch for one of the seed products in the corn seed market for the Midwest, resulting in substantial monetary damages to Miller Hybrids.

9) Thus, Miller Hybrids brings this lawsuit to recover its losses and damages caused by Agrality and Excel.

**The Parties**

10) Plaintiff, Miller Hybrids, Inc. ("Miller Hybrids"), is an Iowa corporation, with its principal place of business in Kalona, Iowa.

11) Defendant Agrality Seeds, Inc., ("Agrality") is an Indiana corporation, with its principal place of business located in Tippecanoe County, Indiana.

12) Defendant Excel Ag Solutions, LLC, ("Excel") is a Michigan limited liability company, with its principal place of business in Sturgis, Michigan.  The members of Excel are: (a) David Mumby, an individual domiciled in Michigan; (b) Jason Schwenk, an individual domiciled in Michigan; and (c) Alva Wall, an individual domiciled in Michigan.  Thus, Excel is a citizen of Michigan.

### Jurisdiction and Venue

13) This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14) All other claims asserted in this action arise out of the same transaction or occurrence, so that this court has supplemental jurisdiction over all additional claims asserted in this action under 28 U.S.C. § 1367(a).

15) This court has personal jurisdiction over Excel because, *inter alia*, Excel has, and continues to, purposely engage and direct business in Indiana, including advertising, marketing, and soliciting clients in Indiana, and contracting with Indiana seed companies to provide commercial seed production and conditioning services.  Excel is regularly engaged in commercial seed production, conditioning, and storage services for seed companies and seed growers throughout the Midwest, including Indiana and Iowa.  Further, Excel contracted with Agrality, an Indiana corporation, to perform the conditioning, sampling, testing, bagging, and labeling services that are the subject of this Complaint.

16) Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events and omissions giving rise to the claims occurred in this district, both Agrality and Excel are subject to personal jurisdiction in this district, and a forum selection clause of the services contract between Miller Hybrids and Agrality specifies the Southern District of Indiana as the exclusive forum for disputes.

### Background

### Breeding and Production of Hybrid Corn Seed

17) Plant breeding is the human manipulation of the characteristics, structure, and composition of plants to produce heritable changes that make them more useful to growers. For

commercial corn, this is an iterative, multi-year process in which breeders cross, screen, and select plants across many generations and across multiple geographies to develop lines with desired traits such as yield, disease resistance, and herbicide tolerance.

18) Two foundational techniques in commercial corn breeding are inbred development and hybridization. An inbred line is developed by self-pollinating a plant over many generations until nearly all of its genes are homozygous, so that the inbred reliably passes its traits to progeny.  Hybridization is the crossing of two genetically distinct inbred parent lines to produce a first-generation (F1) hybrid that expresses the desired combination of traits inherited from both parents.  Inbred seeds are the core germplasm used as parent seeds by plant breeders; they are typically not sold at retail to the public but may be licensed to other plant breeders or seed companies for use in creating different hybrids. For hybrid crops such as corn, the F1 hybrid seed is the commercial product of plant breeding and is what is sold to farmer-customers.

19) Modern commercial corn hybrids may also incorporate transgenic traits, i.e., man-made genes integrated in the plant's genome to confer a particular trait, such as herbicide tolerance or insect resistance. A stacked-trait hybrid is one that incorporates multiple such transgenic traits.

20) Commercial hybrid seed production is a carefully planned and controlled process.  Parent seed lines that are used to make a hybrid are planted in dedicated, isolated production fields in a controlled row pattern.  Industry practice requires minimum isolation distances from other corn, dedicated equipment, cleaned planters, and field records sufficient to trace every bushel of harvested seed back to the specific production lot and parent cross from which it originated.

21) Breeders commonly contract with third-party growers and conditioners to produce commercial hybrid seed. This allows the breeder to obtain sufficient isolation and acreage, to diversify weather risk across geographies, and to access facilities and equipment dedicated to seed production.

22) Seed conditioning, the process of preparing seed for sale to customers, is also a technical process requiring dedicated machinery, including mechanical sorters, sizers, and gravity tables. Conditioning involves cleaning the seed after harvest, removing broken kernels and unwanted foreign material, sorting seed by size, and sampling each seed lot for testing by accredited seed laboratories. Conditioning facilities handling multiple varieties must follow strict lot-integrity protocols - dedicated bins, cleanout procedures between lots, sealed sample retention, and labeled traceability records.  If these procedures are not followed, varieties will be commingled and/or mis-identified.

23) During the conditioning process, samples of each seed lot are collected and submitted to an accredited seed laboratory for testing, including germination testing and testing for the presence of transgenic traits.  Germination testing confirms that the seed meets the minimum germination standards required under federal and state seed laws before it can be offered for sale.  Trait testing confirms whether the seed lot contains, or does not contain, transgenic traits, such as herbicide-tolerance.  A seed lot may not lawfully be labeled as containing or lacking a particular trait unless it has been tested and confirmed by an accredited seed laboratory.

24) The final step in the process is the bagging, tagging, and labeling of the seed.  Each finished lot of commercial hybrid seed must be bagged, tagged, and labeled in accordance with federal and state seed laws. The Federal Seed Act, 7 U.S.C. § 1571(a), and state analogues including the Indiana Seed Law, § 15-15-1-1 *et seq.*; Iowa Seed Law, § 199.1 *et seq.*; Michigan Seed Law,

§ 286.701 *et seq.*, require that every container of agricultural seed sold in interstate and intrastate commerce be labeled accurately as to variety, kind, lot number, and material traits. Mislabeling agricultural seed is a violation of state and federal law, regardless of intent.

25) Because the buyer of hybrid seed - whether a farmer, an independent seed company, or a testing partner - cannot determine variety, parentage, or trait content by visual inspection of the kernel, the buyer is wholly dependent on the producer's lot-integrity controls and on the accuracy of the producer's labeling. The integrity of the production, conditioning, and labeling chain is therefore the foundation of the commercial seed industry.

### The Hybrid Corn Seed at Issue

26) Miller Hybrids was founded by Bob Miller, an established commercial plant breeder with more than thirty years of professional experience developing elite corn inbreds and hybrids. Before founding Miller Hybrids, Bob Miller worked as a commercial corn breeder for Syngenta and DeKalb - two of the largest seed companies in the United States - where he developed numerous commercial inbred lines and hybrids that have been sold and planted by farmers across the country. His research career has focused on selection for improved emergence, yield stability, and drought tolerance, the agronomic characteristics that determine whether a corn hybrid performs reliably across the wide range of soils, weather patterns, and management systems that farmers actually encounter.

27) While still employed by Syngenta, Bob Miller purchased farms in Iowa in 1990, 1994, and 2000. In 2005 he founded Miller Hybrids to apply his commercial breeding experience to the development of corn hybrids suited to the diverse growing conditions of the Midwest. He continues to serve as Miller Hybrids' owner, president, and research director, and remains personally involved in the selection, evaluation, and placement of the hybrids developed by Miller Hybrids and licensed to commercial partners. Bob Miller's professional reputation in

7

the commercial corn-breeding community, and the goodwill associated with the Miller Hybrids name in that community, are central to the company's ability to license its genetics to foundation seed companies and to other commercial seed companies - and to the damages alleged in this Complaint.

28) In 2022, Miller Hybrids contracted with Agrality to produce five hybrid corn seed products, including the following hybrid products: (i) M13-55BG, (ii) MPB11-60, and (iii) M10-54. A copy of the contract is attached as **Exhibit A**.

29) Each of these hybrid products was developed by Miller Hybrids over several years of research and testing, and they were designed to meet different needs and market segments:

    a. The M13-55BG hybrid variety is a premium stacked-trait hybrid, containing two herbicide tolerance traits (glyphosate and glufosinate), as well as an insect resistance trait for corn borer;

    b. The MPB11-60 hybrid variety is a blend of two conventional varieties (containing no transgenic traits), designed for farmers to grow corn for the non-GMO market;

    c. The M10-54 variety is a conventional variety (containing no transgenic traits), designed for farmers to grow corn for the non-GMO market.

These hybrid corn products are the subject of this lawsuit.

30) The Agrality contract is a template form drafted unilaterally by Agrality and presented to Miller Hybrids on a take-it-or-leave-it basis. Miller Hybrids had no meaningful opportunity to negotiate the terms of the agreement, and several sections of the contract are ambiguous and difficult to interpret as written.

31) Under the contract template, Agrality agreed to provide a collection of services to produce five hybrid corn products for Miller Hybrids, including:

    a. all farming activities (i.e., planting, cultivation, harvesting);

    b. trucking, husking, drying and shelling the harvested corn;

    c. conditioning the corn seed;

    **d.**  testing the seed for germination;

    **e.**  for seed containing transgenic traits, testing to confirm the presence of the relevant traits;

    **f.**  bagging the seed with accurate labeling as to variety, germination, varietal purity, and traits; and

    **g.**  delivering the fully finished seed products to Miller Hybrids.

**32)** Agrality's template contract also included a collection of warranties regarding its production services, including:

    **a.**  "[u]sing personnel of skill, experience and qualifications reasonably necessary to perform the Services . . ."; and

    **b.**  performance would be completed "In a timely, workmanlike, and professional manner in accordance with generally recognized industry standards for similar services."

**33)** At some point after the contract was entered into, Agrality outsourced the conditioning, bagging, and labeling duties to Excel.  Miller Hybrids does not presently have full and robust information regarding the nature of the outsourcing and relationship between Agrality and Excel, but is of the knowledge and understanding that the conditioning, testing, bagging, and labeling of all of the hybrid corn seed products was performed by Excel at its facilities in Michigan.  Miller Hybrids will need to conduct discovery into the full nature of Excel's interactions and relationship with Agrality regarding the issues in this lawsuit.

**34)** During the 2022 growing season, Excel communicated directly with Miller Hybrids regarding the production of the seed products.

**35)** Once the seed crop matured in the fall of 2022, on information and belief, Agrality harvested the seed and subsequently delivered it to Excel to perform the remaining steps to prepare the seed for Miller Hybrids, including:

    a.  conditioning the seed (cleaning, sizing, and sorting);

    b.  collecting lot samples and sending those samples to be tested by accredited seed laboratory for germination, varietal purity, and traits;

    c.  bagging and labeling the seed lots by variety name and the relevant results from the seed lab testing.

36) Once these steps were completed by Excel at its facilities in Michigan, it shipped the finished seed products to Miller Hybrids' seed warehouse in Iowa in February 2023.

37) As the 2023 crop planting season approached (typically around mid to late March), Miller Hybrids began shipping its own branded inventory of hybrid corn seed to its farmer customers, a routine part of Miller Hybrids' business for over 20 years.

38) In addition, Miller Hybrids sought to license the M13-55BG hybrid to other seed companies to sell in their branded product line-ups because it was a "stacked" hybrid, i.e., it contained multiple transgenic traits sought by farmers who demand complete trait packages in a single seed.  Thus, Miller Hybrids placed M13-55BG with Peterson Corn Genetics ("PCG"), a leading foundation seed company, capable of introducing the variety in multiple markets for commercial licensing.

39) As the 2023 season started, PCG placed M13-55BG in several test sites and with several other independent seed companies for farmer demonstration plots.   These are critical commercialization stages for new corn hybrids, allowing potential licensees to evaluate and observe performance in multiple environments.

40) The first inkling that something was amiss occurred on May 29, 2023, when one of Miller Hybrids' customers called to report that his M13-55BG corn crop was dying after he sprayed it with glyphosate.  Since that variety should have contained a glyphosate-tolerance trait, spraying the crop with glyphosate should not have impacted the crop.

10

41) With this report, Miller Hybrids initially became concerned that the traits in M13-55BG were not being properly expressed and therefore were not functioning as intended.

42) Given that the corn season was entering a critical time for stand establishment and the yield potential of the crop was being set, Miller Hybrids promptly warned its customers and others that had planted M13-55BG not to spray their crops with glyphosate or glufosinate due to concerns about trait performance.  Miller Hybrids informed this group of growers to switch to a different herbicide program (one without glyphosate and glufosinate) and not to rely on the traits in M13-55BG.

43) Because switching herbicide programs would increase the growers' production costs, Miller Hybrids offered to compensate them for their increased herbicide costs.

44) For the growers that had already sprayed their M13-55BG crops with glyphosate (which caused those crops to die) Miller Hybrids took remedial steps to help them salvage their growing season, including:

   a.  providing free seed for replanting the affected acreage;

   b.  reimbursement for replanting costs; and

   c.  compensation for the reduction in yield due to planting later than the optimal planting window.

45) Miller Hybrids had no reason to suspect mislabeling at the time of delivery because Excel's pre-shipment trait testing had confirmed the presence of M13-55BG's commercial glyphosate tolerance.

46) As Miller Hybrids took remedial actions to assist its customers, it continued to investigate the causes of M13-55BG's ostensible susceptibility to its herbicide-tolerance traits.  It collected samples from each seed lot received from Excel and sent them to the Iowa State University seed lab for testing.  This testing revealed that one of the three seed lots that Excel labeled as

11

M13-55BG was not that variety at all, but was instead M10-54, a conventional hybrid that contained no traits.

47) The other two lots of M13-55BG were confirmed to have the correct trait package and therefore to be correctly labeled.  Nonetheless, this confirmation was too late for those growers that had been warned to switch herbicide programs.

48) Moreover, PCG had received the mislabeled M13-55BG for the various trials and plots in which it had deployed the hybrid. Thus, when the trait performance of the hybrid was drawn into question, PCG abandoned it throughout the entire commercial launch.

49) The ill-will and notoriety garnered by M13-55BG amongst growers and customers by these events effectively ruined Miller Hybrids' opportunity to commercialize the hybrid, both in the Miller Hybrids branded products, as well as other commercial licensees.

50) As Miller Hybrids continued its investigation, it discovered that its inventory of M13-55BG was lower than what should have been delivered by Excel.  This led Miller Hybrids to test another hybrid blend, MPB11-60, a conventional-only product.  This testing confirmed that the lots of MPB11-60 had been improperly blended and commingled with M13-55BG, which as explained above, contains multiple transgenic traits (i.e., is a GMO variety).  MPB11-60 was marketed and sold to growers for the conventional corn market, a segregated commodity market for non-GMO grain.  Accordingly, the MPB11-60 delivered by Excel was unsaleable as either conventional corn or traited corn, making it useless.

51) One of the most important and fundamental aspects of producing crop seed for sale to farmers is the maintenance of varietal identity and lot integrity throughout the entire process, from planting, to harvesting, to conditioning, bagging and labeling.  In short, seed lot integrity is a crucial aspect of the entire seed business, and the value of hybrid corn seed as a commercial

product depends on the accurate presence of the true variety and traits in each bag of seed delivered to a customer under that label.

52) Hybrid corn seed is a product whose conformity to specification - variety, parentage, transgenic trait content, and varietal purity - cannot be ascertained by any commercially reasonable inspection of the finished bagged product.  Identity-preservation failures, commingling, and mislabeling are by their nature undetectable by the purchaser of finished seed until the seed is planted, grown, and managed under field conditions, which inevitably occurs months after delivery.

53) Excel, on behalf of Agrality, delivered the finished seed products to Miller Hybrids in or about February 2023. The first manifestation of the mislabeling and commingling occurred on or about May 29, 2023, when a Miller Hybrids customer reported that his M13-55BG corn crop had been destroyed by a glyphosate application that the labeled trait package should have tolerated. The latent defects at issue could not have been, and were not, discoverable by Miller Hybrids by any commercially reasonable means until the seed had been sold, delivered and planted to produce a crop.

### Count I - Breach of Contract - Agrality

54) Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint herein.

55) The contract between Agrality and Miller Hybrids required Agrality to provide a set of services for the production of five hybrid corn products for Miller Hybrids, including:

    a.   all farming activities (i.e., planting, cultivation, harvesting);

    b.   trucking, husking, drying and shelling the harvested corn;

    c.   conditioning the corn seed;

13

    **d.**  testing the seed for germination;

    **e.**  for seed containing transgenic traits, testing to confirm the presence of the relevant traits;

    **f.**  bagging the seed with accurate labeling as to variety, germination, varietal purity, and traits; and

    **g.**  delivering the fully finished seed products to Miller Hybrids.

**56)** Agrality breached the contract by, *inter alia*, failing to accurately sample the seed lots to confirm the presence of the relevant traits, failing to bag the seed with accurate labeling as to variety, germination, varietal purity, and traits, and failing to comply with the well-established standards of the commercial seed trade governing equipment cleanout, lot segregation, traceability, sampling, testing, and labeling - standards that exist precisely because the identity and traits of finished seed cannot be verified by inspection.

**57)** At all relevant times, Miller Hybrids performed and fulfilled all of its obligations under the contract.

**58)** By the time Agrality's breaches were discoverable: (a) the services were complete and the contract had expired by its own terms; and (b) the limited remedy of cure by Agrality under its template contract had become impossible - no post-delivery cure could undo the planting of mislabeled seed, the destruction of farmer crops, the abandonment of the M13-55BG launch by Peterson Corn Genetics, or the commingling of conventional inventory with GMO traits.

**59)** The Agrality contract therefore provided Miller Hybrids no meaningful remedy as written for the very type of breach that Agrality knew, or should have known, presented the most serious foreseeable risk arising from its services: the failure to preserve the identity, traits, and varietal purity of the seed Miller Hybrids entrusted it to produce.

14

60) The Limited Warranty, Limitation of Remedy, and Limitation of Liability provisions of Agrality's contract are void and unenforceable, as applied to the facts of this case, for the following independent and alternative reasons:

    a.  unconscionability;

    b.  illusory warranty;

    c.  public policy mandated by federal and state seed laws; and

    d.  the expiration of the contract on its own terms before the latent breaches were discoverable.

61) Miller Hybrids has suffered damages as a result of Agrality's breach, including:

    a.  providing replacement seed and amounts paid to reimburse farmer-customers for replanting expenses, late-plant yield loss, and increased herbicide program costs;

    b.  the value of commingled MPB11-60 inventory rendered unsaleable by Agrality's mishandling;

    c.  testing, sampling, delivery, travel, and management costs incurred in investigating and confirming Agrality's failures;

    d.  lost royalty revenue from the destroyed commercial launch of M13-55BG;

    e.  lost margin on the sale of M13-55BG under the Miller Hybrids brand; and

    f.  loss of goodwill, customer relationships, and reputation among growers, independent seed companies, and foundation seed partners.

These damages and losses are no less than $500,000.00.

62) Miller Hybrids is entitled to recover all compensatory, incidental, consequential, and special damages incurred as a result of Agrality's breach.

63) Miller Hybrids is entitled to recover its costs and attorney fees in this action, to the extent permitted by applicable law or contract.

## Count II - Breach of Warranty - Agrality

64) Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint herein.

65) Agrality's template contract included a collection of warranties regarding its production services, including:

   a. "[u]sing personnel of skill, experience and qualifications reasonably necessary to perform the Services . . ."; and

   b. the services would be completed "In a timely, workmanlike, and professional manner in accordance with generally recognized industry standards for similar services."

66) Agrality breached these warranties by, *inter alia*, failing to use personnel of skill, experience and qualifications necessary to produce and deliver seed with accurate labeling as to variety, germination, varietal purity, and traits; failing to deliver fully finished seed products to Miller Hybrids; and failing to perform the seed production services in a workmanlike and professional manner in accordance with generally recognized industry standards for hybrid corn seed products.

67) Miller Hybrids has suffered damages as a result of Agrality's breach, including:

   a. providing replacement seed and amounts paid to reimburse farmer-customers for replanting expenses, late-plant yield loss, and increased herbicide program costs;

   b. the value of commingled MPB11-60 inventory rendered unsaleable by Agrality's mishandling;

   c. testing, sampling, delivery, travel, and management costs incurred in investigating and confirming Agrality's failures;

   d. lost royalty revenue from the destroyed commercial launch of M13-55BG;

   e. lost margin on the sale of M13-55BG under the Miller Hybrids brand; and

   f. loss of goodwill, customer relationships, and reputation among growers, independent seed companies, and foundation seed partners.

These damages and losses are no less than $500,000.00.

16

68) Miller Hybrids is entitled to recover all compensatory, incidental, consequential, and special damages incurred as a result of Agrality's breach of warranty.

69) Miller Hybrids is entitled to recover its costs and attorney fees in this action, to the extent permitted by applicable law or contract.

## Count III - Negligence (Direct and Vicarious) - Agrality

70) Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

71) Agrality undertook to perform - and held itself out to Miller Hybrids and to the broader commercial seed industry as competent to perform - the production, conditioning, sampling, testing, bagging, labeling, and shipping of regulated hybrid corn seed for sale into interstate commerce. By undertaking that work, Agrality assumed duties of reasonable care that arose independently of any contractual undertaking and were owed to Miller Hybrids and to the broader regulated community of seed buyers and growers.

72) Agrality's duties of reasonable care arose from sources independent of the Agrality contract, including but not limited to:

   a. the Federal Seed Act, which makes it unlawful to ship adulterated or misbranded agricultural seed in interstate commerce and which establishes a federal regulatory regime for the labeling, sampling, testing, and identity of commercial seed;

   b. the Indiana Seed Law, the Michigan Seed Law, and the Iowa Seed Law, each of which imposes duties on commercial seed conditioners and handlers operating within their respective states;

   c. the common-law duty of reasonable care owed by one who undertakes a specialized commercial service of a regulated nature to those foreseeably affected by the proper performance of that service; and

   d. the well-established standards of the commercial seed trade governing equipment cleanout, lot segregation, traceability, sampling, testing, and labeling - standards that

17

exist precisely because the identity and traits of finished seed cannot be verified by inspection.

73) These duties exist and are owed independently of the Agrality contract. They run to Miller Hybrids, to Miller Hybrids' customers and licensees, and to the broader community of growers and seed buyers who rely on the integrity of regulated commercial seed handling.

74) At some point after Miller Hybrids and Agrality entered into the services contract, Agrality outsourced to Excel the performance of material services Agrality had undertaken to perform for Miller Hybrids, including the conditioning, sampling, testing, bagging, labeling, and shipping of Miller Hybrids' hybrid corn seed products.

75) Agrality is liable for the negligent acts and omissions of Excel under each of the following independent theories:

76) Agency. Excel performed the services as Agrality's agent, on Agrality's behalf, for Agrality's benefit, and pursuant to Agrality's direction and control. Agrality is liable for Excel's negligence in the course of performing the agency.

77) Non-delegable duty. The duties to preserve seed lot integrity, to accurately label agricultural seed for interstate commerce, and to comply with the Federal Seed Act and analogous state seed laws are non-delegable. Agrality could not, and did not, divest itself of those duties by retaining Excel to perform the underlying services.

78) Negligent selection and supervision. Agrality was independently negligent in selecting Excel to perform the services Agrality had undertaken for Miller Hybrids; in failing to audit, inspect, supervise, or otherwise verify the adequacy of Excel's conditioning, sampling, and labeling systems; and in failing to detect and correct Excel's commingling and mislabeling before delivery to Miller Hybrids.

18

79) Apparent authority and undertaking. Agrality held itself out to Miller Hybrids as the entity performing the contracted services. Miller Hybrids relied on Agrality's undertaking and was not in privity with Excel. Agrality cannot disclaim responsibility for the work it undertook by pointing to Excel's role in performing it.

80) Agrality, both directly and through Excel acting on Agrality's behalf, breached its duties of reasonable care to Miller Hybrids by, including but not limited to:

  a. commingling lots of MPB11-60 (a conventional, non-GMO hybrid blend) with M13-55BG (a stacked-trait GMO hybrid), rendering the MPB11-60 inventory unsaleable in either the GMO or the conventional corn markets;

  b. mislabeling and packaging an entire seed lot of M10-54 (a conventional hybrid containing no transgenic traits) as M13-55BG (a stacked-trait GMO hybrid), and shipping that mislabeled lot into interstate commerce;

  c. failing to implement and follow industry-standard equipment cleanout, lot segregation, and traceability protocols sufficient to prevent commingling and mislabeling across multiple varieties;

  d. failing to accurately collect, label, document, and submit representative samples to the accredited seed laboratory engaged to confirm trait content and varietal purity;

  e. failing to label the seed accurately as to variety, lot number, traits, germination, and varietal purity, in violation of the Federal Seed Act and analogous state seed statutes;

  f. failing to detect or correct the commingling and mislabeling at any stage before delivery to Miller Hybrids; and

  g. failing to audit, inspect, supervise, or verify the adequacy of Excel's conditioning, sampling, and labeling operations notwithstanding Agrality's having entrusted to Excel the material services Agrality had undertaken to perform for Miller Hybrids.

81) Mislabeling and adulterating agricultural seed shipped in interstate commerce violates the Federal Seed Act and the corresponding state seed statutes. Agrality's conduct, directly and through Excel acting on Agrality's behalf, constitutes negligence *per se*.

82) The production, conditioning, sampling, testing, bagging, and labeling of Miller Hybrids' hybrid corn seed were under the exclusive control of Agrality, directly or through Excel acting

19

on Agrality's behalf, at all relevant times. The commingling and mislabeling of multiple distinct seed varieties within such an integrated production and conditioning system does not ordinarily occur in the absence of negligence by the entity in control of that system. There is a complete absence of evidence of any other cause for the commingling, mixing-up, and mislabeling of the hybrid corn seed products. Accordingly, the doctrine of *res ipsa loquitur* applies and supports an inference of negligence.

83) Agrality's breaches of its duties of reasonable care, directly and through Excel acting on Agrality's behalf, were the direct and proximate cause of substantial damages to Miller Hybrids and to property and interests other than the subject of the Agrality contract, including but not limited to:

  a.   the destruction of farmer-customers' standing corn crops in fields across Iowa, Illinois, and elsewhere - property of third parties for whose damage Miller Hybrids was obligated to and did make reimbursement;

  b.   the rendering of Miller Hybrids' inventory of MPB11-60 unsaleable in either the GMO or the segregated conventional corn market by commingling with M13-55BG;

  c.   amounts paid to reimburse farmer-customers for replant seed, replanting expenses, late-plant yield loss, and increased herbicide program costs;

  d.   testing, sampling, delivery, travel, and management costs incurred in investigating and confirming the failure;

  e.   lost royalty revenue from the destroyed commercial launch of M13-55BG;

  f.   lost margin on the sale of M13-55BG under the Miller Hybrids brand; and

  g.   loss of goodwill, customer relationships, and reputation among growers, independent seed companies, and foundation seed partners.

84) As a direct and proximate result of Agrality's negligence, both direct and vicarious, Miller Hybrids has suffered damages in an amount no less than $500,000.00.

85) Miller Hybrids is entitled to recover its costs and attorney fees in this action, to the extent permitted by applicable law or contract.

**Count IV - Negligence - Excel**

86) Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

87) Excel undertook to perform - and in fact did perform - conditioning, sampling, testing, bagging, labeling, and shipping of Miller Hybrids' hybrid corn seed products, including M13-55BG, MPB11-60 and M10-54, at Excel's facilities in Michigan during the 2022 growing season and through delivery in or about February 2023.

88) As a commercial seed conditioner and producer holding itself out as competent to handle proprietary, valuable, and federally and state-regulated hybrid corn seed for sale in interstate and intrastate commerce, Excel owed Miller Hybrids an independent duty of reasonable care, including the duty to:

    a.   maintain the varietal identity and lot integrity of each variety of seed entrusted to its care;

    b.   follow industry-standard protocols for equipment cleanout between varieties, lot segregation, and traceability;

    c.   accurately collect, label, document, and submit representative samples to accredited seed laboratories for trait and varietal purity confirmation;

    d.   accurately tag, label, and identify each container of seed as to variety, lot number, traits, germination, and varietal purity, consistent with the Federal Seed Act, the Iowa Seed Law, the Indiana Seed Law, and the Michigan Seed Law; and

    e.   deliver to Miller Hybrids only seed that was correctly identified, accurately labeled, and uncontaminated by commingling with genetically distinct material.

89) Excel knew, or in the exercise of reasonable care should have known, that Miller Hybrids, Miller Hybrids' customers, Miller Hybrids' commercial licensees, and Miller Hybrids' foundation seed partners could not verify the identity, traits, or varietal purity of the finished seed by inspection of the kernels, and that each would necessarily and foreseeably rely on the accuracy of Excel's processing, sampling, testing, labeling, and documentation.

21

90) Excel breached its duty of care to Miller Hybrids in multiple respects, including but not limited to:

   a. commingling lots of MPB11-60, a conventional, non-GMO hybrid blend, with M13-55BG, a stacked-trait GMO hybrid, rendering the MPB11-60 inventory unsaleable in either the GMO or the segregated conventional corn market;

   b. mislabeling and packaging an entire seed lot of M10-54, a conventional hybrid containing no transgenic traits, as M13-55BG, a stacked-trait GMO hybrid, and shipping that seed into interstate commerce;

   c. failing to implement and follow industry-standard equipment cleanout, lot segregation, and traceability protocols sufficient to prevent commingling and mislabeling across multiple seed varieties;

   d. failing to accurately collect, label, document, and submit representative samples to the accredited seed laboratory engaged to confirm trait content and varietal purity;

   e. failing to detect or correct the commingling and mislabeling at any stage before delivery to Miller Hybrids; and

   f. shipping the mislabeled and commingled seed to Miller Hybrids for distribution to farmer-customers and for the commercial launch of M13-55BG.

91) Mislabeling agricultural seed shipped in interstate commerce violates the Federal Seed Act and the corresponding state seed statutes, including the Indiana Seed Law, the Iowa Seed Law, and the Michigan Seed Law. These statutes were enacted to protect commercial seedsmen such as Miller Hybrids from precisely the harm alleged herein. Excel's conduct in mislabeling and commingling the seed products constitutes negligence *per se*.

92) The conditioning equipment and facilities, the sampling and testing process, and the bagging and labeling operations were within the exclusive control of Excel at all relevant times.

93) The commingling and mislabeling of multiple distinct seed varieties under Excel's sole care does not ordinarily occur in the absence of negligence by the entity in control. There is a complete absence of evidence of any other cause for the commingling, mixing-up, and

mislabeling of the hybrid corn seed products. Accordingly, the doctrine of *res ipsa loquitur* applies and supports an inference of negligence by Excel.

94) Excel's failures were not isolated; they affected multiple seed lots across multiple distinct hybrid corn products processed in the same 2022 growing season at Excel's facilities. These failures evidence a systemic and pervasive failure to implement and maintain basic identity-preservation, lot-integrity, sampling, and labeling controls required of any competent commercial seed conditioner. Such conduct constitutes gross negligence and a reckless disregard for the rights of Miller Hybrids and the broader community of seed buyers protected by federal and state seed laws.

95) Miller Hybrids has suffered damages as a result of Excel's negligence, including:

   a. providing replacement seed and amounts paid to reimburse farmer-customers for replanting expenses, late-plant yield loss, and increased herbicide program costs;

   b. the value of commingled MPB11-60 inventory rendered unsaleable by Excel's mishandling;

   c. testing, sampling, delivery, travel, and management costs incurred in investigating and confirming Excel's failures;

   d. lost royalty revenue from the destroyed commercial launch of M13-55BG;

   e. lost margin on the sale of M13-55BG under the Miller Hybrids brand; and

   f. loss of goodwill, customer relationships, and reputation among growers, independent seed companies, and foundation seed partners.

These damages and losses are no less than $500,000.00.

96) Miller Hybrids is entitled to recover all compensatory, incidental, consequential, and special damages incurred as a result of Excel's negligence.

97) Miller Hybrids is entitled to recover its costs and attorney fees in this action, to the extent permitted by applicable law or contract.

23

## Jury Trial Demanded

**98)** Plaintiff demands a trial by jury on all issues so triable in this Complaint.

WHEREFORE, the Plaintiff, Miller Hybrids, Inc., prays that Defendants, Agrality Seeds, Inc. and Excel Ag Solutions, LLC, be required to appear and answer the allegations of this Complaint and for the following:

**(i)**     For judgment for compensatory, incidental, consequential, and special damages in an amount to be proven at trial against Agrality for breach of contract;

**(ii)**    For judgment for compensatory, incidental, consequential, and special damages in an amount to be proven at trial against Agrality for breach of warranty;

**(iii)**   For judgment for compensatory, incidental, consequential, and special damages in an amount to be proven at trial against Agrality for negligence;

**(iv)**    For judgment for compensatory, incidental, consequential, and special damages in an amount to be proven at trial against Excel for negligence and negligence *per se*;

**(v)**     For judgment awarding Plaintiff its costs and attorney fees incurred in this action, to the extent permitted by applicable law or contract;

**(vi)**    For judgment awarding Plaintiff pre-judgment and post-judgment interest, and costs; and

**(vii)**   For any and all such other relief which may be just and proper under the circumstances and to which Plaintiff may be entitled.

Respectfully submitted,
**Cape Law Firm, PLC**

By: /s/ Joel E. Cape
Joel E. Cape, SDIN Bar No. 26001
217 E. Dickson Street, Suite 106
Fayetteville, AR 72701
Phone: (479) 856-6008
Fax:     (479) 856-6288
jcape@capefirm.com

**Attorneys for Plaintiff, Miller
Hybrids, Inc.**